1
2
3
4
5
6
7
8
9
10

**UNITED STATES DISTRICT COURT**

EASTERN DISTRICT OF CALIFORNIA

11

SHERI L. NELSON,

Case No.  1:15-cv-00696-SKO

12

Plaintiff,

**ORDER ON PLAINTIFF'S SOCIAL SECURITY APPEAL**

13

v.

14

CAROLYN W. COLVIN,

15

Acting Commissioner of Social Security,

16

Defendant.

17

_____

18

## I.    INTRODUCTION

19

Plaintiff, Sheri L. Nelson ("Plaintiff"), seeks judicial review of a final decision of the

20

Commissioner of Social Security (the "Commissioner") denying her application for Disability

21

Insurance Benefits ("DIB") pursuant to Title II of the Social Security Act.  42 U.S.C. § 405(g).

22

The matter is currently before the Court on the parties' briefs, which were submitted, without oral

23

argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[1]

24

## II.    FACTUAL BACKGROUND

25

Plaintiff was born on August 11, 1960, and alleges disability beginning on March 1, 2011.

26

(Administrative Record ("AR") 34; 230-43.)  Plaintiff claims she is disabled due to chronic back

27

problems, depression, and fibromyalgia.  (*See* AR 93; 253; 266.)

28

---

[1]    The parties consented to the jurisdiction of a U.S. Magistrate Judge.  (Docs. 4; 6.)

1   **A.     Relevant Medical Evidence**

2          On March 10, 2008, a thoracic spine x-ray revealed thoracic scoliosis (AR 346) and a

3   cervical spine x-ray revealed degenerative changes including cervical disk space narrowing at C5-

4   C6 and C6-C7 with hypertrophic spurring most pronounced posteriorly at C5-C6, left C5-C6 and

5   C6-C7 neural foraminal narrowing, right C5-C6 neural foraminal narrowing, arthritic changes of

6   the lateral masses, and curvature potentially indicating muscle spasm (AR 347).   On June 19,

7   2008, Plaintiff had a magnetic resonance imaging study done of her lumbar spine which revealed

8   multilevel degenerative disk and facet changes without central canal stenosis, mild foraminal

9   narrowing as several levels, and multilevel spondylolistheses.  (AR 344-45.)

10         On May 13, 2010, Plaintiff saw family practitioner and pain management specialist Dr.

11  Timothy Hooper, M.D., with pain in her low back, ankle, and hip as well as depression and an

12  anxiety disorder.  (AR 383-86.)  She described the back pain as constant, chronic, and moderate in

13  intensity  and  described  feelings  of  worthlessness  and  a  tendency  toward  indecisiveness.

14  (AR 383.)  Dr. Hooper noted Plaintiff enjoys gardening, reading, and shopping, practices yoga,

15  and can bathe herself, clean the house, cook meals, dress herself, feed herself, drive a car, live

16  independently, and converse in a meaningful manner, but cannot ride in public transportation.

17  (AR 384.)  On examination, Plaintiff appeared fatigued and in moderate pain, with a slowed gait,

18  stiffness and pain with range of motion in the neck, pain with range of motion in the shoulders,

19  hips, and ankles, crepitus in neck and ankles, and tenderness in the low back, posterior neck, and

20  bilateral shoulders.  (AR 385-86.)  Dr. Hooper diagnosed ankle pain, hip pain, and low back pain

21  as well as depressive disorder, for which he prescribed baclofen and Norco.  (AR 386.)

22         On June 9, 2010, Plaintiff told Dr. Hooper that her pain had been increasing while at work,

23  especially with job-related repetitive lifting, bending over, twisting, throwing, and pushing heavy

24  objects.   (AR 379.)   She reported relief with heat, stretching, and narcotic pain medication.

25  (AR 379.)  Examination findings were unchanged and Plaintiff also presented with new positive

26  straight leg raises, Hoover test, pelvic rock test, and Faber test.  (AR 381-82.)  Dr. Hooper refilled

27  Plaintiff's Norco and benazepril prescriptions.  (AR 382.)  On July 7, 2010, Dr. Hooper noted

28  complaints of fatigue, hip pain, and low back pain, noted positive symptoms of depression and no

symptoms of anxiety, feelings of stress, difficulty concentrating, or sleep disturbance, and refilled Plaintiff's Norco prescription.  (AR 377-78.)  On August 2, 2010, Plaintiff reported that work had been "stressful" and that she was "very tired from working so hard," her pain was a little worse, and her medication was not helping.  (AR 371.)  Dr. Hooper refilled Plaintiff's Norco and methadone medications (AR 374) and on August 27, 2010, Dr. Hooper also assessed Plaintiff with chronic pain, low back pain, fatigue, and depressive disorder.  (AR 369.)

On September 22, 2010, Plaintiff saw Dr. Hooper to discuss treatment with anti-depressants, having admitted to "severe depression" despite taking Effexor, Wellbutrin, and Deplin to treat her depressive symptoms.  (AR 362.)  On mental status examination, Plaintiff displayed an anxious and depressed mood and affect, with pressured speech, flight of ideas, circumstantial associations, worry about everything, and only fair judgment.  (AR 364.)  Dr. Hooper affirmed the diagnosis of depressive disorder and refilled her Deplin.  (AR 365.)

On October 20, 2010, Plaintiff reported ongoing problems at work and complained her low back pain, upper back pain, and depression continued despite medication.  (AR 358.)  Dr. Hooper refilled Plaintiff's methadone and Norco medications and prescribed the muscle relaxant Flexeril to help treat Plaintiff's chronic pain.  (AR 361.)  On November 17, 2010, Plaintiff reported that her medication was keeping her pain between a 4/10 and a 6/10, and reported that the "current pain relief makes a real difference for her" and noted "improvements in physical functioning, mood, sleep patterns, and overall function."  (AR 354.)  Dr. Hooper refilled Plaintiff's methadone and Norco prescriptions.  (AR 357.)  On December 13, 2010, Dr. Hooper noted Plaintiff was being seen for "generalized pain and fatigue, low back pain, upper back pain, and muscle aches, and depression" and admitted she was not doing exercises.  (AR 349.)  Plaintiff's pain was worst in her lumbar spine, with radiation to her thighs.  (AR 349.)  She characterized the pain as "constant, moderate in intensity, dull, throbbing, and aching."  (AR 349.)  The diagnoses of chronic pain, muscle aches, fatigue, and depressive disorder were affirmed, with methadone and Norco again refilled.  (AR 352-53.)  Dr. Hooper also noted the "muscle aches" were diagnosed two years prior by "the family doctor" due to "the presence of tenderness at specified tender points when pressure to the site is applied, symptoms present continuously for over 3 months, and pain present in all

four body quadrants (upper and lower, front and back)."  (AR 349.)  Plaintiff described the

intensity of these tender points as moderate and episodic but consistently worsening.  Plaintiff

reported that

> . . . Primary joints affected include shoulders, right wrist, and ankles.  Tender spots include entire back, both scapular regions, shoulders, the left, right, upper, mid, and lower posterior neck, left posterior hip, right, inner and left, inner knee, right, lateral and left, lateral elbow, shoulders, hands, and ankles.   Associated symptoms include interrupted sleep, difficulty falling asleep, and poor sleep, myalgias described as throbbing, joint stiffness (for <30 mins after arising in the AM) and "gelling" of joints after periods of inactivity. . . . [Plaintiff] has tried ibuprofen, Hydrocodone, going to a chronic pain specialist (with fair results), relaxation therapy (with mixed effectiveness), and stretching exercises (with mixed effectiveness).

(AR 349-50.)

On January 10, 2011, Dr. Hooper noted Plaintiff's chronic, moderate pain continued, mostly localized to the neck, back, and bilateral thighs, and was aggravated by bending, lifting, movement in general, and walking.  (AR 477.)  On examination, Plaintiff was in mild pain and appeared tired; and had neck stiffness with decreased range of motion and crepitus, a slowed gait, pain on shoulder ranges of motion, back pain with flexion and extension, and pain with range of motion in both hips and ankles.  (AR 479-80.)  Dr. Hooper affirmed his diagnoses of chronic pain as well as low- and upper back pain, and refilled Plaintiff's methadone and Norco.  (AR 480.)  At her February 2011 follow-up, Plaintiff requested a decrease in the methadone and reported it was making her "very sleepy at work."  (AR 473.)

On March 2, 2011 Ms. Nelson saw osteopathic doctor Zuhra Musherraf, D.O., and reported being "very stressed and crying most of the time," being unable to "function," and having to leave work early.  (AR 483.)  She had an appointment scheduled with psychiatry the following week but felt she could not wait that long.  (AR 483.)  Although she was on Wellbutrin and Effexor, she asked for a change in her medications and to begin counseling.  (AR 483.)  Plaintiff's appointment with psychiatry was rescheduled for the next day, and she saw psychiatrist Nancy Kenyon Nelson, M.D., on March 3, 2011.  (AR 483; 490.)  Plaintiff reported having had "a really hard time" at work the preceding week and told Dr. Kenyon Nelson she had been unable to work at all the preceding two days.  (AR 490.)  Plaintiff reported ongoing difficulties with her

1   supervisor, crying episodes, and digestive issues due to her stress.  (AR 490.)

2          On mental status examination, Plaintiff exhibited fidgety behavior, very soft-spoken

3   speech, an anxious and down mood, an anxious and dysphoric affect, distractibility, impaired

4   concentration, an only "fair" fund of knowledge, insight, and judgment, and occasional impulsive

5   spending.  (AR 489.)  Her score on the Patient Health Questionnaire-9 was consistent with "severe

6   depression," with one response indicating that she had moments when "she wished God would

7   take her" but denied specific suicidal ideation.   (AR 489.)   Her score on the Burns Anxiety

8   Inventory was indicative of "severe anxiety."  (AR 489.)  Dr. Kenyon Nelson adjusted Plaintiff's

9   dosages of Effexor, Zoloft, and Wellbutrin and recommended that she attend "work stress groups"

10  and "anxiety groups" in the following weeks.  (AR 490.)  Dr. Kenyon Nelson diagnosed her with

11  Major Depressive Disorder, recurrent, and Generalized Anxiety Disorder; with a GAF[2] of 31 to

12  40, 2 indicative of "some impairment."  (AR 490.)  On March 8, 2011, Dr. Kenyon Nelson noted

13  that Plaintiff had not attended the work stress group or the anxiety group and was therefore

14  noncompliant with their agreed treatment plan.  (AR 503.)

15         On March 2, 2011, workers' compensation psychologist John Paul Beaudoin, Ph.D., stated

16  that Plaintiff had a stable medical condition "not likely to improve with active medical or surgical

17  treatment" supported by both "subjective complaints" and "abnormal examination findings."

18  (AR 199.)  On March 24, 2011, Plaintiff was seen at Forest Road Prompt Care by Dr. Daniel C.

19  Meador, M.D., requesting to be taken off work secondary to severe-job related anxiety.  (AR 389.)

20  Plaintiff was tearful, stating that her supervisor was creating such stress for her that she was

21  "unable to function in the workplace." (AR 389.)  Dr. Meador noted, however, that he had spoken

22  with Gilbert Silva, P.A., who had confirmed that Job Care believed that her anxiety was

23  "nonindustrial" in nature. (AR 389.)  Dr. Meador diagnosed Plaintiff with "anxiety, job-related"

24  and prescribed one-week of Ativan and excused her from work for five days, advising her to

25  follow up with mental health services.  (AR 389.)

26

27  [2]    Global Assessment of Functioning (GAF) scale score is a numeric scale (1 through 100) used by mental health
     clinicians and physicians to rate subjectively the social, occupational, and psychological functioning of adults.  DSM-
28  IV-TR at 34.

On March 7, 2011, Plaintiff was off work on medical leave and complained to Dr. Hooper that she was "very stressed from work" and experiencing hip pain, neck stiffness, and anxiety. (AR 469.)  Physical examination findings were unchanged, and psychiatric examination showed her to have an agitated, anxious mood and affect.   (AR 471-72.)   Dr. Hooper diagnosed generalized anxiety and in addition to renewing her methadone and Norco prescriptions, added a prescription for the muscle relaxant Soma.  (AR 472.)

From March 30 through May 12, 2011, Plaintiff saw psychologist Arlene Giordano, Ph.D., FICPP, on an approximately weekly basis in conjunction with her worker's compensation claim due to workplace stress.  (AR 422-27.)  On March 25, 2011, Dr. Giordano opined Plaintiff would need to remain on stress leave from work through May 2, 2011 (AR 427) and on April 29, 2011, Dr. Giordano opined Plaintiff would need to take an additional six weeks stress leave from work (AR 424).  On May 18, 2011, Plaintiff called to cancel her appointment and future appointments because her workers' compensation claim had been denied.  (AR 452.)

On April 4, 2011, Dr. Hooper observed a slowed gait, pain with range of motion in the neck, shoulders, back, hips, and ankles, tenderness in the low back, posterior neck, and bilateral shoulders, and intact memory, attention, and concentration.   (AR 467.)   Dr. Hooper refilled Plaintiff's Norco for hip pain and methadone for chronic pain syndrome, and noted Plaintiff was taking Zoloft and Wellbutrin for her psychiatric symptoms. (AR 465; 468.)  Plaintiff reported that Norco and methadone had provided meaningful pain relief, with improvements in physical function, family relationships, and overall function, but not in social relationships, mood, or sleep patterns.  (AR 465.)   The medications were also causing constipation and fatigue.  (AR 465.)  Physical examination findings remained the same, with psychiatric examination showing an anxious and depressed mood and affect, pressured speech, flight of ideas, circumstantial associations, unreasonable worry about everything, and only fair judgment.  (AR 468.)   Dr. Hooper diagnosed Plaintiff with chronic pain syndrome, generalized anxiety, and insomnia in addition to hip pain and neck stiffness.  (AR 468.)

In May 2011, Plaintiff reported having "[t]rue panic attacks" in addition to generalized anxiety several times per week, with triggers including occupational stressors.  (AR 457; 461.)

1   Dr. Hooper refilled Norco and methadone for low back pain (AR 464) and at the end of the month,

2   noted Sertraline, Soma, Wellbutrin, methadone, Norco, and Effexor and as current medications

3   (AR 459).

4        On July 15, 2011, Plaintiff's pain index was three and she presented with a slowed gait,

5   pain with range of motion in the neck, shoulders, back, hips, and ankles, and tenderness in the low

6   back, posterior neck, and bilateral shoulders.  (AR 451-52.)  Dr. Hooper stated that Plaintiff would

7   pick up methadone for low back pain the following week.  (AR 452.)  Plaintiff had gained weight

8   and reported ongoing low back pain, stiffness, and paravertebral spasm, depression, and

9   hypertension.  (AR 449.)  Plaintiff reported a positive difference in her depression with the

10  Cymbalta and asked to discontinue Norco.  (AR 449).  Dr. Hooper noted Plaintiff's primary form

11  of exercise was walking.  (AR 449.)  Physical examination findings remained unchanged.

12  (AR 451-52.)

13       On August 8, 2011, clinical psychologist John-Paul Beaudoin, M.Div., Ph.D., Q.M.E.,

14  performed a qualified medical evaluation on behalf of the state agency.  (AR 407-12; 528-33.)

15  Plaintiff related a "pattern of work stress and a hostile work environment created by the

16  dysfunctional management style of her Supervisor" while working as a receptionist.  (AR 402-03.)

17  Plaintiff reported subjective complaints of sadness, anhedonia, failure, being overwhelmed,

18  crying, social isolation, difficulty making decisions, diminished motivation, sleep disturbance, loss

19  of appetite, loss of libido, and experiencing "pain throughout [her] body."  (AR 403.)  Plaintiff did

20  not finish high school, as she dropped out after becoming pregnant in the 10th grade.  (AR 405.)

21       Dr. Beaudoin noted Plaintiff was pleasant, cooperative, and apologetic, presenting with a

22  sad and tearful mood; a somewhat constricted, mildly depressed affect; speech somewhat elevated

23  in rate; oriented to time, place, person, and situation; non-verbal expressions indicating anxiety,

24  shame, and distress; intermittent tearfulness; somewhat fast speech; vagueness in her descriptions

25  of remembered events; and reports of having been depressed since her injury, with periods of

26  sadness, tearfulness, anhedonia, guilt, self-recrimination, social isolation, decreased appetite,

27  somatic complaints, and disturbed sleep; goal-oriented thought processes within normal limits;

28  and no abnormal thought content, though she described having little life energy.  (AR 413.)

1    Dr. Beaudoin administered the Beck Anxiety and Depression Inventories, which were
2  consistent with moderate depression but no anxiety disorder.  (AR 414.)  On the Minnesota
3  Multiphasic Personality Inventory II ("MMPI-II"), Plaintiff achieved scores that were likely valid
4  according to validity profiles that detect maladjustment and somatic complaint.  (AR 415-16.)  Her
5  scores in the clinical scales were reflective of "significant psychological difficulties," with
6  elevated depression and introversion scores.  (AR 416.)  Dr. Beaudoin also administered a Brief
7  Symptom Inventory ("BSI") test, on which Ms. Nelson's scores were consistent with a moderate
8  level of distress with multiple symptoms, evidence of self-recrimination, poor self-esteem, self-
9  doubt, feelings of inadequacy, elevated depression, and intense social alienation.  (AR 416.)  Dr.
10 Beaudoin diagnosed Plaintiff with Major Depressive Disorder, recurrent and moderate, with Axis
11 II diagnoses of Passive Dependent Personality Traits, difficulty making everyday decisions and
12 expressing disagreement, and fear of confrontation, all of which affect her ability to cope with
13 conflictual work and interpersonal situations.  (AR 417.)  Dr. Beaudoin assessed Plaintiff with a
14 GAF score of 55.  (AR 417.)  He found that Plaintiff's psychiatric injuries "are not predominantly
15 or substantially caused by the actual events of employment but are the culmination of a preexisting
16 pattern of dysfunction and concurrent stressors."  (AR 418.)  He found Plaintiff "temporarily
17 totally disabled" on a non-industrial basis since March 3, 2011, but opined that she had not yet
18 "reached permanent and stationary" disability status.  (AR 418-20.)

19    On August 18, 2011, Plaintiff saw Dr. Hooper for worsening symptoms of depression and
20 a mood stabilizer was added to her medication regimen.  (AR 444-48.)  On September 15, 2011,
21 Plaintiff reported continued low back pain, neck pain, and anxiety and reported that her depression
22 was still uncontrolled despite taking Cymbalta, Wellbutrin, Effexor, and Zoloft.  (AR 44; 443.)
23 Dr. Hooper refilled Plaintiff's Lorazepam prescription for her anxiety and added Depakote for her
24 depression.  (AR 445.)  Plaintiff's pain index was four.  (AR 443.)  Examination of Plaintiff's
25 back was grossly normal, including normal gait, but there was also some pain elicited by
26 palpation. Plaintiff reported upper back pain, anxiety, and depression.  (AR 444.)

27    On October 18, 2011, Plaintiff's pain index was three (AR 439) and Plaintiff had a slowed
28 gait and pain with range of motion in the neck, shoulders, back, hips, and ankles (AR 439-40).

8

Plaintiff reported she was still experiencing chronic pain radiating from her left neck to her upper back and left shoulder, and described the pain as "moderate in intensity, constant, cramping, pulling, and throbbing." (AR 437.) Dr. Hooper prescribed Baclofen for low back pain. (AR 441.) On November 15, 2011, Dr. Hooper noted a slowed gait, pain with range of motion in the neck, shoulders, back, hips, and ankles, and tenderness in the low back, posterior neck, and bilateral shoulders. (AR 435; 546.) Dr. Hooper refilled Plaintiff's prescription for methadone and prescribed Cymbalta for her low back pain, refilled Baclofen for her neck pain, and refilled Lorazepam for her anxiety. (AR 436; 546-47.) Dr. Hooper noted Plaintiff's fatigue was currently "quite severe in intensity" but that there were "no problems with initiation or maintenance of sleep" and that the amount of sleep Plaintiff got each night was "quite variable." (AR 433.) Her methadone, Cymbalta, Baclofen, and Lorazepam prescriptions were all refilled. (AR 436.)

On December 13, 2011, Dr. Hooper noted a slowed gait, pain with range of motion in the neck, shoulders, back, hips, and ankles, tenderness in the low back, posterior neck, and bilateral shoulders, and intact memory, attention, and concentration. (AR 432; 551.) He refilled Plaintiff's prescription for methadone for her low back pain, refilled Baclofen for her neck pain, prescribed Lorazepam and Zoloft for her anxiety, added a prescription for Doxycycline, and noted she was currently also taking Effexor. (AR 431-32.) Dr. Hooper noted Plaintiff's physical health was contributing to her anxiety. (AR 429.) Her physical examination findings remained unchanged, and she again showed an anxious and depressed mood and affect with pressured speech, flight of ideas, circumstantial associations, abnormal worry, and fair judgment. (AR 432.)

On January 10, 2012, Dr. Hooper noted Plaintiff was taking methadone, Norco, Flexeril, and Baclofen for pain and Zoloft, Deplin, Lorazepam, and Effexor for her mental health. (AR 599.) Plaintiff's pain index was four and she demonstrated a slowed gait, pain with range of motion in the neck, shoulders, back, hips, and ankles, and tenderness in the low back, posterior neck, and bilateral shoulders. (AR 599-600.) Plaintiff complained of stiffness, paravertebral spasm, leg weakness, interrupted sleep, difficulty falling asleep, throbbing myalgias, joint stiffness for up to half an hour in the mornings, fatigue, anxiety, and depression. (AR 597.) Examination revealed an anxious and tired appearance, looking to be in moderate pain; neck stiffness with

decreased ranges of motion and crepitus; a slowed gait; painful ranges of neck motion; pain in the shoulder and back ranges of motion; tenderness in the low back, posterior neck, and bilateral shoulders; and an anxious mood and affect.  (AR 600.)  Dr. Hooper diagnosed Plaintiff with fibromyalgia, neck and low back pain, and fatigue, and continued her on methadone, Baclofen, and lorazepam.  (AR 600.)

On February 14, 2012, Dr. Hooper noted Plaintiff's pain index was three and observed a slowed gait; pain with range of motion in the neck, shoulders, back, hips, and ankles; and tenderness in the low back, posterior neck, and bilateral shoulders.  (AR 595.)  Plaintiff reported experiencing an anxious mood, appetite changes, altered sleep habits, crying spells, decreased concentration, and fatigue, all of which were frequent and present most days.   (AR 592.) Examination revealed pain to palpation of several identified regions of the body; decreased deep tendon reflexes; diminished muscular strength in the quadriceps and gluteal muscles; as well as the continued findings yielded on prior examination.  (AR 594-95.)  Dr. Hooper refilled Plaintiff's prescriptions for methadone for low back pain and Lorazepam for anxiety, and prescribed Zyprexa for depression.  (AR 595-96.)

On March 21, 2012, Plaintiff's pain index was three and Dr. Hooper observed a slowed gait; pain with range of motion in the neck, shoulders, back, hips, and ankles; and tenderness in the low back, posterior neck, and bilateral shoulders.  (AR 590-91.)  He refilled methadone for low back pain and Lorazepam for muscle spasms.  (AR 591.)  On July 24, 2012, Plaintiff complained of abdominal pain, low back pain, anxiety, and depression and reported a pain index of four. (AR 584; 586.)  On examination, Plaintiff's back was grossly normal and she had a normal gait, but palpation of the bilateral cervical, thoracic, and lumbar paraspinal muscles, bilateral gluteus muscles, and bilateral posterior superior iliac crest elicited some pain and spasm was noted in her bilateral cervical, thoracic, and lumbar paraspinal muscles.  (AR 586-87.)  Dr. Hooper refilled Plaintiff's prescriptions for methadone for low back pain and Lorazepam for anxiety.  (AR 587.) On August 29, 2012, Plaintiff told Dr. Hooper that she had been decreasing her methadone over the past month from five doses a day to two or three doses a day, and stated that she would like to discuss tapering off methadone entirely.  (AR 583.)

1    On September 18, 2012, Plaintiff presented with continued symptoms of fibromyalgia and
2    moderate depression and anxiety, complained of a pain index of three, and was observed to have a
3    slowed gait; pain with range of motion in the neck, shoulders, back, hips, and ankles; and
4    tenderness in the low back, posterior neck, and bilateral shoulders.  (AR 581.)  Dr. Hooper refilled
5    Plaintiff's methadone for her pain and added Trazadone for her fatigue.  (AR 581-82.)  Plaintiff
6    reported averaging 12 hours of sleep per night.  (AR 578.)  On October 12, 2012, Plaintiff reported
7    having to take an extra methadone for a couple of days "due to severe back [pain] after cleaning a
8    friend[']s house" and was given a new prescription.  (AR 577.)

9    On November 20, 2012, Plaintiff presented to Dr. Hooper with complaints of anxiety,
10   depression, insomnia, and fibromyalgia (AR 572), and Dr. Hooper added a diagnosis of
11   osteoarthritis of the hand (AR 576).  On examination, Plaintiff's back was grossly normal and she
12   presented with normal gait, but there was also some pain elicited by palpation.  (AR 575.)  Dr.
13   Hooper refilled methadone for fibromyalgia, Trazadone for insomnia, and Lorazepam for anxiety,
14   and, for low back pain, recommended alternating cold packs and moist heat, massage, and home
15   back strengthening exercises.  (AR 576.)

16   Dr. Hooper also completed a fibromyalgia questionnaire based on his own treatment
17   history, Plaintiff's past radiological and magnetic resonance imaging (MRI) findings, and her
18   tenderness, pain, and depression complaints.  (AR 554-59.)  Dr. Hooper opined Plaintiff meets the
19   American College of Rheumatology criteria for fibromyalgia and shows evidence of multiple
20   tender points, non-restorative sleep, chronic fatigue, morning stiffness, muscle weakness,
21   subjective swelling, irritable bowel syndrome, temporo-mandibular joint dysfunction, numbness
22   and tingling, anxiety, panic attacks, depression, and chronic fatigue syndrome.  (AR 555.)

23   Dr. Hooper further opined that emotional factors contribute to the severity of her
24   symptoms and functional limitations, that her impairments frequently interfered with her attention
25   and concentration, and that she is not a malingerer.  (AR 555-56.)  Dr. Hooper opined that Plaintiff
26   is markedly limited in her ability to handle stress and, in a competitive work environment, she
27   could sit or stand no more than 15 minutes at a time and for less than a total of two hours each;
28   that she needs to walk every 15 minutes for 10 minutes each time; that she needs to be able to

11

change positions frequently for 15- to 30-minute periods; that she could lift or carry up to 10 pounds occasionally and no weight frequently; that she has significant limitations in performing repetitive reaching, handling, or fingering; that she is likely to miss work more than three times per month; and that she would be "ok to work 2 h[ou]rs per day over [an] 8-h[ou]r period." (AR 556-58.)  Dr. Hooper listed May 13, 2010, the date he began treating Plaintiff, as the earliest date the identified limitations would apply.  (AR 559.)  Dr. Hooper also apparently had trouble with the questionnaire, first seeming to write a date in 2010, then crossing it out and dating it instead November 20, 2012, and writing one street address, then crossing it out and listing another. (*See* AR 559.)  The handwriting in the questionnaire itself also appears to be different than the printing used on the last page to fill in Dr. Hooper's name and address.  (*Compare* AR 554-58 *with* AR 559.)

In a letter dated November 21, 2012, Dr. Hooper noted he had treated Plaintiff since May 2010 for osteoarthritis, fibromyalgia, and chronic pain syndrome that caused symptoms of severe joint pain, back pain, neck pain, bilateral hip pain, severe muscle spasms, and moderate depression.  (AR 553.)  Dr. Hooper opined that "the sum of the impairments of the above diagnoses result in a disability rating precluding most if not all work."  (AR 553.)

On November 27, 2012, Plaintiff called to follow-up about a letter needed for her disability hearing and to report an increase in her methadone usage due to an increase in pain possibly related to stress and the fact that she was moving.  (AR 571.)  On January 16, 2013, Plaintiff was seen for ongoing depression, osteoarthritis of moderately severe intensity, continued low back pain with stiffness and spasm, and fibromyalgia.  (AR 566.)  She continued to experience impaired sleep, myalgias, and a "gelling" of her joints after periods of inactivity.  (AR 566.)  Plaintiff reported to Dr. Hooper that hydrocodone, administered by a pain specialist, had only impaired "fair results" and relaxation therapy and stretching had provided "mixed effectiveness."  (AR 566.)  Dr. Hooper diagnosed moderate depression and generalized anxiety, low back pain, and fibromyalgia; added Seroquel to Plaintiff's Lorazepam regimen; recommended avoidance of caffeine and stress reduction to help with Plaintiff's anxiety; recommended alternating cold packs and moist heat, massage, and home back strengthening exercises for Plaintiff's back pain; and

12

recommended increased physical activity, a support group, no substance abuse, and social interaction to treat Plaintiff's moderate depression. (AR 569-70.) For hypertension, he recommended avoiding licorice and pseudoephedrine or other stimulants/decongestants in common cold remedies; decreasing consumption of alcohol; routine monitoring of blood pressure; having someone monitor Plaintiff for loud snoring or sleep apnea; exercise; reduction of dietary salt intake; taking medication as prescribed; smoking cessation; weight loss; and stress reduction. (AR 569-70.)

On March 13, 2013, Plaintiff saw Dr. Hooper for constipation and wrist and neck pain. (AR 562.) Dr. Hooper observed a slowed gait; pain with range of motion in the neck, shoulders, back, hips, and ankles; and tenderness in the low back, posterior neck, and bilateral shoulders. (AR 565.) Dr. Hooper prescribed Flexeril for neck pain and refilled methadone for fibromyalgia and Lorazepam for depression. (AR 565.) Plaintiff's medications were refilled in May 2013 (AR 615-16) but in July 2013, Dr. Hooper substituted morphine for the methadone (AR 611-12). Dr. Hooper refilled Plaintiff's morphine prescription in August 2013 for her persistent fibromyalgia and low back pain. (AR 620-21.)

In a letter dated July 30, 2013, Dr. Hooper again reported he had treated Plaintiff for fibromyalgia, osteoarthritis, and chronic pain syndrome since May 2010. (AR 618.) Dr. Hooper reported Plaintiff experienced severe joint pain, back pain, neck pain, bilateral hip pain, severe muscle spasms, and moderate depression as a result of her impairments, and displayed multiple positive tender points, poor sleep and chronic fatigue, morning stiffness, muscle weakness, numbness and tingling, anxiety, panic attacks, and chronic fatigue syndrome. (AR 618,) Dr. Hooper noted Plaintiff "experiences pain in the lumbosacral, thoracic, and cervical spine; left shoulder, right arm, and bilateral hands and fingers; and in the hips, legs, knees, ankles, and feet" and that the pain is worsened by "movement, overuse, stress, and specific positions." (AR 618.)

Dr. Hooper's opined limitations were largely consistent with the sitting, standing, and walking limitations of his November 2012 opinion. (AR 618; *see also* AR 554-59.) Dr. Hooper opined Plaintiff is unable to sit or stand for more than 15 minutes at a time, for a total of less than two hours each of sitting, standing, or walking in an eight-hour workday; that she is unable to lift

more than 20 pounds; that she could lift no more than 10 pounds on an occasional basis; and that she is "significantly limited" in her ability to perform fine or gross manipulations or use her arms to reach.  (AR 618.)  Dr. Hooper opined Plaintiff's pain was "severe enough to interfere with her attention and concentration on a frequent basis" and she would miss more than three days of work per month.  (AR 618.)  Dr. Hooper concluded that Plaintiff would be precluded "from most, if not all, work."  (AR 618.)

**B.     Testimony**

      **1.       Plaintiff's Self-Assessments**

On October 28, 2011, Plaintiff completed an adult function report and stated that on a normal day she wakes up between 9:30 and 11:00 a.m., tries to get dressed by about 1:00 p.m., tries to straighten out the house, maybe washes her face and brushes her teeth, and essentially waits until she can go back to bed.  (AR 244.)  Plaintiff recently had her dog euthanized, but it is unclear if this was because she could no longer take care of her dog or for some other reason. (AR 245.)  Plaintiff has difficulty sleeping because she cannot stay in the same position long. (AR 245.)  Her hands and feet go numb, her hips and back hurt badly, and her anxiety causes her to stay awake.  (AR 245.)  When she is feeling "very depressed," she goes "many days without showering" and has difficulty getting dressed.  (AR 245 ("I feel kind of immobilized with anxiety and feelings of being overwhelmed and sadness.").).

Plaintiff rarely prepares meals, but eats "mostly frozen food, cold cereal, … fruit, [and] a lot of ice cream."  (AR 246.)  Plaintiff finds it exhausting to stand for very long and she lacks motivation to try to cook.  (AR 246.)  She is physically able to perform household chores "in moderation," but she "seldom do[es] them."  (AR 246.)  Anything requiring bending or squatting requires Plaintiff to rest because it is "very painful to [her] back."  (AR 246.)  She only goes outside when she "absolutely ha[s] to" and is very anxious when going out alone.  (AR 247.)  She is able to drive and ride in a car, though when she is feeling too anxious she will not drive. (AR 247.)  Plaintiff shops for groceries and household supplies every couple weeks for about 2-3 hours at a time.  (AR 247.)  She cannot stay out longer because her back becomes sore and her legs become weak.  (AR 247.)

1   Plaintiff no longer enjoys her former hobbies and interests, and "want[s] to feel better so

2   badly but nothing seems to help" and "get[s] tired easily and ha[s] a difficult time staying

3   focused." (AR 248.)   She spends time with her boyfriend and visits with him 2-4 times a week,

4   and speaks with her children on the phone every couple of weeks.   (AR 248.)   She does not feel

5   comfortable around people most of the time, even her own family, and does not participate in any

6   social activities.   (AR 249.)

7   Plaintiff has difficulties with "everything" depending on how she is feeling, and complains

8   that she is forgetful, her fibromyalgia causes total body soreness, and she tends not to finish what

9   she has started.   (AR 249.)   Although she can sometimes walk a mile, at other times her hips and

10   legs will start hurting right away and she must rest immediately.   (AR 249.)   She has difficulty

11   concentrating and making decisions and needs time to adjust to any new routine.   (AR 249-50.)

12   On October 27, 2011, Plaintiff completed a pain questionnaire and reported that she has

13   experienced progressively worsening back pain over the past 19-20 years and a recent onset of

14   joint and muscle pain over the past year.   (AR 292.)   Plaintiff's pain is in her back, neck, hips,

15   thighs, feet, wrists, hands, fingers, knees, and legs and while it "mostly aches" the constant pain

16   makes her "very tired and weak."   (AR 292.)   The pain is brought on by standing, changing

17   positions, sitting in a position for more than a few minutes, sleeping, moving to standing from

18   sitting or lying supine, holding something tightly, or performing some sort of manipulation.

19   (AR 292.)   She takes Cymbalta, Zoloft, ibuprofen, "Bacliphen" (*sic*), and methadone, and

20   previously took Norco for five years.   (AR 292.)   Depending on her level of pain, she can walk up

21   to one mile and stand and sit thirty minutes to one hour.   (AR 294.)

22   Plaintiff also completed a fatigue questionnaire and reported that she

23   . . . started feeling very tired about 6 months into my last job.  I could not keep my eyes open sitting at my desk.  I would drink coffee and go for short walk[s] on my

24   breaks to stretch my back and neck, when I would get back to my desk I would still feel sleepy and have a hard time doing my job.  It took everything in me not

25   to cry at work.

26   (AR 297.)   She is unable to complete chores because her back, legs, and hips become "very tired

27   when standing at the sink" and mopping and vacuuming make her "very tired and achy."

28   (AR 297.)   She tries to take daily walks but "some days I just don't feel up to it." (AR 298.)   She

15

sometimes takes naps, "especially if I've been on my feet a lot." (AR 298.) She is "distracted easily" and can only finish tasks when "they're not too demanding." (AR 298.) She found the act of completing the adult function report, pain questionnaire, and fatigue questionnaire "very overwhelming" and "horribly stressful." (AR 298.)

On May 28, 2012, Plaintiff completed a disability report for her appeal. (AR 301-08.) She reported increased pain and frequency of numbness in her hands, fingers, and wrists, and increased pain in her feet, ankles, legs, knees, and neck, causing headaches. (AR 301; 307.) She also reported new pain in her jaw. (AR 302.) Her anxiety had worsened, and she feels constantly "overwhelmed" and "unstable" and had begun avoiding "being around people." (AR 307.) She requested reconsideration of her case because "[i]f I had more money I could get some tests done to find out what is wrong with me. There is no way I could work or even look for a job feeling as I do." (AR 308.) She reported cancelling doctors' appointments because she lacked funds and feeling like her treating physician was not helping her as much as he could because she didn't have insurance. (AR 308.) On December 3, 2012, Plaintiff reported that her full body pain had worsened. (AR 312.)

Plaintiff had a very minimal earnings record, with most years from 1978 through 2009 below substantial gainful activity levels. (AR 237-43.) She had earnings at the substantial gainful activity level in 2010, while working as a receptionist. (AR 240-41; *see also* AR 256; 259.)

**2.      Third-Party Assessment**

On October 26, 2011, Plaintiff's boyfriend of five years, Mike Wulf, completed a third-party adult function report that is substantially identical to Plaintiff's self-report. (*Compare* AR 244-52 *with* 273-82.) Mr. Wulf noted he saw Plaintiff 2-3 times a week, and would watch television with her, sometimes go to the movies with her, help her cook, and help her complete household chores. (AR 273.) On an average day, Plaintiff watches television, reads cookbooks, and talks to her family members on the telephone. (AR 273.) She stays in her pajamas for days at a time, bathes sporadically, and keeps her hair in a bun rather than washing it. (AR 274.) Plaintiff eats frozen dinners, cold cereal, and ice cream. (AR 275.) "She can do the laundry and cleaning, when her back and other physical ailments will allow her" and "the time to do these chore[s]

1   varies depending on how she is feeling (physically and emotionally)." (AR 275.)  Mr. Wulf noted

2   Plaintiff "gets totally overwhelmed when it comes to paying bills and dealing with money" and

3   "she is easily distracted and now does not do as many things as she used to." (AR 277.)

4       Mr. Wulf reported Plaintiff "has back problems and her joints ache a lot" but checked

5   significantly less limitations than Plaintiff had claimed.  (*Compare* AR 249 *with* 278.)   He

6   reported Plaintiff only had difficulties with lifting, bending, standing, walking, stair climbing,

7   completing tasks, following instructions, using her hands, and memory and concentration.

8   (AR 278.)  He expressed concern that Plaintiff no longer cooked the more elaborate meals she

9   used to cook, and noted that Plaintiff "will seem to be fine for a couple of days and then the fear

10  and anxiety will set in and she can't go outside or answer the phone, and if anyone but me knocks

11  at her door she will run and hide in her bedroom." (AR 280.)

12      **3.    Hearing Testimony**

13          **a.    Plaintiff's Testimony at Hearing**

14      Plaintiff testified that she had last worked in 2011 as a receptionist.  (AR 45.)  She had

15  gone out on stress leave in March 2011 and had not returned to work.  (AR 46.)  She has severe

16  pain in the lower- and mid-back, increased by standing and vacuuming.  (AR 46-47.)  Walking

17  hurts her feet and she is unable to sit for a full day.  (AR 47.)  She lies down every day for a

18  couple of hours in addition to sleeping twelve hours a night.  (AR 47-48.)  She uses heat and ice to

19  help with her back pain and tried physical therapy and water therapy when she had insurance;

20  nothing helped.  (AR 48.)  Every doctor she has treated with has recommended massage, but she

21  cannot afford to get massages.  (AR 48.)  Plaintiff takes morphine three times a day for her pain;

22  though the morphine helps alleviate her pain it is constant.  (AR 56 (testifying "I always have

23  pain.  It doesn't ever go away but it just is not as bad").)

24      Plaintiff has arthritis in her hands and fingers that causes soreness, as well as a throbbing

25  pain in her left wrist that travels up her arm.  (AR 49.)  She uses her home computer for "a half-

26  an-hour or so" at a time and does not have any difficulty using it for such a short period.  (AR 49.)

27  She does not have any difficulty buttoning buttons or zipping zippers but does have difficulty

28  washing dishes, grasping, and picking things up with her hands.  (AR 49-50.)  Her neck "hurts all

the time" and is numb in the back, left side.  (AR 50.)  She has difficulty turning her head while driving but has no difficulty reaching to the sides or overhead.  (AR 50.)  She is able to lift a gallon of milk but would not be able to do so repeatedly.  (AR 51.)

Plaintiff's anxiety prevents her from leaving the house or interacting with the public, and "sometimes [she] just feel[s] like [she] just do[es]n't want to be in [her] skin."  (AR 51.)  She lives with a roommate and splits shopping responsibilities with him.  (AR 51.)  On a normal day, she feeds her cats, tries to stretch, and will try to read, though she has difficulty remembering or understanding what she read.  (AR 53-54; 61-62.)  Plaintiff does yoga tapes at home a couple of times a week.  (AR 62.)  She usually feels worse in the morning than in the afternoon, and if she did some sort of physical activity the day before she will be exhausted even after sleeping.  (AR 54.)

Plaintiff no longer treats with a psychologist because she cannot afford it.  (AR 54-55.)  She reads a Bible and does not go to church because service is too early in the morning.  (AR 55.)  She experiences anxiety even at home, does not like answering the phone or door, and only leaves her home once a week and only when she must.  (AR 57-58.)  Plaintiff's children will occasionally come to visit her, and she visits her elderly mother once a month.  (AR 67.)

Plaintiff testified she would "have a problem getting [to a reception job] every day because [her] mornings are extremely difficult. . . . because [she's] just so sore in the mornings."  (AR 55.)  It usually takes her at least three hours after waking up to feel capable of doing anything, because her "body just feels heavy."  (AR 56.)  She describes walking up stairs as though she has "got sand in [her] legs or something."  (AR 57.)  Plaintiff elaborated she would be unable to work a full eight hours, even if the job were to start at noon, because

> . . . I just don't feel good.  I mean I have this feeling all the time of kind of like, like you're, like I'm catching the flu or something where I just feel achy and tired and have absolutely no energy.  So I do well to get my dishes done and a load of laundry.

(AR 56.)  Plaintiff was diagnosed with fibromyalgia by "tender point analysis" sometime in 2007 or 2008.  (AR 59-60.)

//

18

**b.     Vocation Expert Testimony at Hearing**

The Vocational Expert ("VE") testified at the hearing that Plaintiff had prior relevant work experience as a receptionist, Dictionary of Occupational Titles ("DOT") 237.367-038, sedentary work with an SVP level of 4.[3]   (AR 69.)   The ALJ asked the VE to consider an individual of Plaintiff's same age, education, and work experience who "is limited to light work.   This individual may frequently climb ramps or stairs.   Occasionally climb ladders, ropes, or scaffolds. Frequently balance, occasionally stoop, frequently kneel, occasionally crouch, and frequently crawl."  (AR 69-70.)  The VE testified that such a person could perform Plaintiff's past relevant work as a receptionist.

The ALJ added to the first hypothetical the additional limitation that the individual would be limited to simple, routine, and repetitive tasks.  (AR 70.)  The VE testified that such a person could not perform Plaintiff's past relevant work as a receptionist but could perform alternative work as a ticket taker, DOT 344.667-010, light work with an SVP of 2, and as a hostess, DOT 352.667-010, light work with an SVP of 3.  (AR 70.)  The ALJ asked the VE whether "a person that's limited to simple, routine, and repetitive tasks could do that semi-skilled position [as a hostess]?"  (AR 70.)  The VE testified that she could.  (AR 70.)

The ALJ then added the additional limitation to the first two hypotheticals that the individual would be absent more than two times per month, and the VE testified that such a limitation would preclude all work.  (AR 70.)  The ALJ then added the additional limitation to the first two hypotheticals that the individual would be off task more than 15% of the time, and the VE testified that such a limitation would preclude all work.  (AR 71.)

The ALJ finally asked whether a person

> . . . limited to light work but standing and walking was limited to two hours, so the lifting is 20, 10 for light but could only walk 2 total, well, stand and walk a
>
> total of 2 hours in an 8 hour day.  But on a sustained basis gross and fin[e] manipulation is limited to less than occasional, in other words, throughout an eight hour day the person couldn't handle finger occasionally.  Additionally the

---

[3]     Specific Vocational Preparation ("SVP"), as defined in DOT, App. C, is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.

1
2
individual would need breaks throughout the day due to fatigue exceeding the three breaks typically provided by employers totaling at least two breaks fifteen minutes or greater.

3  (AR 71.)  The VE testified that such a person could not work.

4  **C.    Administrative Proceedings**

5      On September 19, 2013, the ALJ issued a written decision and found that Plaintiff had

6  severe impairments of degenerative disc disease, fibromyalgia, anxiety disorder, and depression.

7  (AR 23.)  The ALJ determined that these impairments did not meet or equal a listed impairment.

8  (AR 24-25.)  The ALJ found Plaintiff retained the residual functional capacity ("RFC")

9
10
11
. . . to perform light work as defined in 20 CFR 404.1567(b) except she could frequently climb ramps or stairs and occasionally climb ladders, ropes, and scaffolds.  She could frequently balance, occasionally stoop, frequently kneel, occasionally crouch, and frequently crawl.  She was limited to simple, routine, repetitive tasks.

12  (AR 25.)

13      Given this RFC, the ALJ found that Plaintiff was unable to perform her past relevant work.

14  (AR 33-34.)  After considering Plaintiff's age, limited education, work experience, and RFC, the

15  ALJ determined there were jobs existing in significant numbers in the national economy Plaintiff

16  could perform, including representative occupations ticket taker, DOT 344.667-010, light work

17  with an SVP 2, and hostess, DOT 352.667-010, light work with an SVP 3[4].  (AR 34.)  The ALJ

18  therefore concluded that Plaintiff was not disabled under the Social Security Act.  (AR 34.)

19      The Appeals Council denied Plaintiff's request for review on March 11, 2015, making the

20  ALJ's decision the Commissioner's final determination for purposes of judicial review.  (AR 1-7.)

21  **D.    Plaintiff's Complaint**

22      On May 6, 2015, Plaintiff filed a complaint before this Court seeking review of the ALJ's

23  decision.  (Doc. 1.)  Plaintiff argues that the ALJ erred in rejecting in whole or in part two medical

24  opinions and in discrediting Plaintiff's subjective testimony.  (Doc. 14.)

25  //

26  //

27
28
[4]    As noted above, when asked whether Plaintiff's limitation to simple, routine, repetitive tasks would preclude her from work as a hostess, the VE testified that should could perform the requirements of work as a hostess.  (AR 34.)

1

### III.   SCOPE OF REVIEW

2        The ALJ's decision denying benefits "will be disturbed only if that decision is not

3  supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599,

4  601 (9th Cir. 1999).  In reviewing the Commissioner's decision, the Court may not substitute its

5  judgment for that of the Commissioner.  *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996).

6  Instead, the Court must determine whether the Commissioner applied the proper legal standards

7  and whether substantial evidence exists in the record to support the Commissioner's findings.  *See*

8  *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).

9        "Substantial evidence is more than a mere scintilla but less than a preponderance." *Ryan v.*

10  *Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).  "Substantial evidence" means "such

11  relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

12  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*,

13  305 U.S. 197, 229 (1938)).  The Court "must consider the entire record as a whole, weighing both

14  the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and

15  may not affirm simply by isolating a specific quantum of supporting evidence." *Lingenfelter v.*

16  *Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

17

### IV.   APPLICABLE LAW

18        An individual is considered disabled for purposes of disability benefits if he is unable to

19  engage in any substantial, gainful activity by reason of any medically determinable physical or

20  mental impairment that can be expected to result in death or that has lasted, or can be expected to

21  last, for a continuous period of not less than twelve months.  42 U.S.C. §§ 423(d)(1)(A),

22  1382c(a)(3) (A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003).  The impairment or

23  impairments must result from anatomical, physiological, or psychological abnormalities that are

24  demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of

25  such severity that the claimant is not only unable to do his previous work, but cannot, considering

26  his age, education, and work experience, engage in any other kind of substantial, gainful work that

27  exists in the national economy.  42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

28  //

1    The regulations provide that the ALJ must undertake a specific five-step sequential
2 analysis in the process of evaluating a disability.  In Step 1, the ALJ must determine whether the
3 claimant is currently engaged in substantial gainful activity.   20 C.F.R. §§ 404.1520(b),
4 416.920(b).   If not, the ALJ must determine at Step 2 whether the claimant has a severe
5 impairment or a combination of impairments significantly limiting her from performing basic
6 work activities.  *Id.* §§ 404.1520(c), 416.920(c).  If so, the ALJ moves to Step 3 and determines
7 whether the claimant has a severe impairment or combination of impairments that meet or equal
8 the requirements of the Listing of Impairments ("Listing"), 20 § 404, Subpart P, App. 1, and is
9 therefore presumptively disabled.  *Id.* §§ 404.1520(d), 416.920(d).  If not, at Step 4 the ALJ must
10 determine whether the claimant has sufficient RFC despite the impairment or various limitations
11 to perform her past work.  *Id.* §§ 404.1520(f), 416.920(f).  If not, at Step 5, the burden shifts to the
12 Commissioner to show that the claimant can perform other work that exists in significant numbers
13 in the national economy.  *Id.* §§ 404.1520(g), 416.920(g).  If a claimant is found to be disabled or
14 not disabled at any step in the sequence, there is no need to consider subsequent steps.  *Tackett v.*
15 *Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

16                              **V.    DISCUSSION**

17    Plaintiff contends the ALJ erred in rejecting the opinions of treating physician Dr. Hooper
18 and examining psychologist Dr. Beaudoin and by finding Plaintiff not credible.  (Docs. 15; 17.)

19 **A.    The ALJ's Consideration of the Medical Evidence**

20    Plaintiff contends the ALJ erred in rejecting the opinions of treating family and pain
21 medicine specialist Dr. Hooper in full and examining psychologist Dr. Bader in substantial part.
22 (Docs. 15; 17.)   The Commissioner responds that the ALJ properly rejected these opinions as
23 inconsistent with and unsupported by the overall record.  (Doc. 16.)

24         **1.    Legal Standard**

25    The medical opinions of three types of medical sources are recognized in Social Security
26 cases: "(1) those who treat the claimant (treating physicians); (2) those who examine but do not
27 treat the claimant (examining physicians); and (3) those who neither examine nor treat the
28 claimant (nonexamining physicians)."  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).

Generally, an examining physician's opinion is entitled to greater weight than a non-examining physician's opinion. *Id*. Where a treating or examining doctor's medical opinion is contradicted by another doctor, the Commissioner must provide "specific and legitimate" reasons for rejecting that medical opinion, and those reasons must be supported by substantial evidence in the record. *Id*. at 830-31; *accord Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 692 (9th Cir. 2009). The ALJ can meet this burden by setting forth a detailed and thorough summary of the facts and conflicting clinical evidence, stating her interpretation thereof, and making findings. *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008). Factors relevant to evaluating medical opinions include the amount of relevant evidence that supports the opinion and the quality of the explanation provided and the consistency of the medical opinion with the record as a whole. *See Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)(3)-(6)).

### 2.    The ALJ's Consideration of Dr. Hooper's Medical Opinion

The ALJ noted that although Dr. Hooper's November 2012 medical statement and fibromyalgia questionnaire were completed after Plaintiff's date last insured, they were fully considered as Dr. Hooper indicated his findings predated September 30, 2012, Plaintiff's date last insured.  (AR 32.)  The ALJ found that while Dr. Hooper's statements regarding Plaintiff's inability to work "are consistent with his function-by-function assessment, none of these are supported by the record, including his own treatment notes."  (AR 33.)  The ALJ found Dr. Hooper's opinion to be "overall inconsistent with the record" and granted it minimal weight. (AR 33.)

The ALJ first noted Dr. Hooper based his opinion, at least in part, on imaging studies taken in 2007 and 2008.  (AR 33.)  The Commissioner contends that because Plaintiff worked after those imaging studies were done, they cannot form the basis for Dr. Hooper's opinion that she is unable to work. (Doc. 16, p. 13.)  However, Dr. Hooper did not rely on the imaging studies alone to support his opinion Plaintiff is unable to work, he also relied on his own extensive treatment record and clinical observations to support his opinion of the functional limitations imposed by Plaintiff's fibromyalgia symptoms.  (AR 554-59.)

//

1    The ALJ found that Dr. Hooper's "actual objective findings during treatment were minimal

2  and limited to tenderness, range of motion, and occasional strength findings." (AR 33.)  However,

3  it is error to "effectively requir[e] 'objective' evidence for a disease that eludes such

4  measurement."  *Benecke v. Barnhart*, 379 F.3d 587, 594 (9th Cir. 2004) (citing *Green-Younger v.*

5  *Barnhart*, 335 F.3d 99, 108 (2d Cir. 2003) (reversing and remanding for an award of benefits

6  where the claimant was disabled by fibromyalgia)); *see also Llamas v. Astrue*, No. 1:09-cv-1503

7  GSA, 2010 WL 5313759, at *9 (E.D. Cal. Dec. 20, 2010) ("Courts have found it error for an ALJ

8  to discount a treating physician's opinion as to resulting limitations due to a lack of objective

9  evidence for fibromyalgia").  Plaintiff consistently reported moderate fibromyalgia symptoms

10  throughout Dr. Hooper's treatment record, and his clinical findings included tenderness, range of

11  motion limitation, and diminished strength, stiffness and crepitus in the neck, a slowed gait,

12  positive straight leg raises, Hoover test, pelvic rock test, and Faber test, and diminished deep

13  tendon reflexes.  (*See* AR 385-600.)  Though "it has long been recognized that the symptoms of

14  fibromyalgia are not proven through objective evidence[,]" *Church v. Colvin*, No. 2:12-CV-1618

15  DAD, 2014 WL 788789, at *5 (E.D. Cal. Feb. 25, 2014), these repeated clinical observations

16  bolster Dr. Hooper's conclusion as to Plaintiff's functional capacity to work based on her chronic

17  pain.

18    The ALJ further discounted Dr. Hooper's credibility "in light of [Plaintiff]'s inconsistent

19  statements."   (AR 33 (noting "the reliability of her subjective allegations" was in question").)

20  Generally, an ALJ need not accept the opinion of any physician, including a treating physician, if

21  that opinion is brief, conclusory, and inadequately supported by clinical findings.  *Thomas v.*

22  *Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002).  However, in the case of fibromyalgia, the ALJ may

23  not discredit medical opinions for being predicated upon a plaintiff's discredited, subjective

24  testimony.  *Green-Younger*, 335 F.3d at 107 (internal punctuation and citation omitted).  The

25  ALJ's refusal to credit Dr. Hooper because his opinion was based only on Plaintiff's subjective

26  statements evidences her misunderstanding of fibromyalgia: "[A] patient's report of complaints, or

27  history, is an essential diagnostic tool" in fibromyalgia cases, and a treating physician's reliance

28  on such complaints "hardly undermines his opinion as to [the claimant's] functional limitations."

1   *Id.*

2       The ALJ also found Dr. Hooper's manipulative findings problematic, as they "are not

3   actually supported by any objective findings and appear to be based on inconsistent subjective

4   allegations." (AR 33.)  As discussed above, fibromyalgia "often lacks medical or laboratory signs,

5   and is generally diagnosed mostly on an individual's described symptoms" and, therefore, the

6   "hallmark" of fibromyalgia is "a lack of objective evidence."  *Moore v. Barnhart*, 405 F.3d 1208,

7   1211 (11th Cir. 2005); *Benecke*, 379 F.3d at 594 (concluding the ALJ erred by "effectively

8   requiring objective evidence for a disease that eludes such measurement"); *Rogers v. Comm'r of

9   Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007) (stating that "fibromyalgia patients present no

10  objectively alarming signs"); *Green-Younger*, 335 F.3d at 108; *Sarchet v. Chater*, 78 F.3d 305,

11  306 (7th Cir. 1996).  The ALJ further discounted Dr. Hooper's opined manipulative limitations as

12  "actually partially inconsistent with [Plaintiff]'s own testimony, which indicated no limitations in

13  reach or fine manipulation." (AR 33.)  A review of hearing testimony, however, reveals that while

14  Plaintiff disclaimed problems with reaching, buttoning buttons, and zippering zippers, she testified

15  to having difficulty washing dishes, grasping, and picking things up and holding things in her

16  hand. (AR 49-50.)  These statements are not inconsistent with Dr. Hooper's opinion that Plaintiff

17  was limited in her ability to perform repetitive reaching, handling, or fingering.  (AR 556-58.)

18  Further, a limitation in the use of Plaintiff's arms for repetitive reaching, handling, or fingering is

19  not inconsistent with her repeated complaints of all-body pain, severe neck pain, and fatigue (*see,

20  e.g.,* AR 349; 369; 385; 429; 433; 440; 465; 477; 479; 597).

21      The ALJ also noted Plaintiff's minimal pain complaint during one examination

22  contradicted Dr. Hooper's assessment. (AR 33.)  Isolating one instance in which Plaintiff reported

23  a "pain index" of 3 out of 10 is only representative of her pain during one appointment while

24  taking narcotic pain medication, not her overall pain.  (AR 33; *see, e.g.,* AR 439 (noting a "pain

25  index" of 3 but elaborating that her average pain over the past week was a 3/10 and her worst pain

26  was a 6/10 and noting that methadone had provided "pain relief [that] makes a real difference for

27  her").)  The ALJ's "selective reliance" on this single instance of reduced pain while ignoring

28  repeated complaints of pain at a higher level (*see, e.g.,* AR 354; 358; 369; 371; 378-79; 383; 433;

461; 465; 477; 597) is insufficient to discredit Dr. Hooper's opinion as to Plaintiff's disabling pain symptoms.  *See Hologhan v. Massanari*, 246 F.3d 1195, 1207 (9th Cir. 2001).  *See also Lester v. Chater*, 81 F.3d 821, 833 (9th Cir.1995) (citing 20 C.F.R. § 404.1512(a) ("Occasional symptom-free periods—and even the sporadic ability to work—are not inconsistent with disability.")).

The ALJ found the "remainder of [Dr. Hooper's] opinion, including regarding concentration, part-time work, handling work stress, and absences," inconsistent with Plaintiff's minimal mental status findings.  (AR 33.)  It is unclear how Dr. Hooper's mental status findings were inconsistent with his opinion, however, because Dr. Hooper repeatedly documented Plaintiff's anxious appearance, anxious and depressed mood and affect, pressured speech, flight of ideas, circumstantial associations, worry, fair judgment, true panic attacks, and tearfulness.  (*See* AR 364-457.)  The Commissioner points to three entries in Dr. Hooper's treatment record to demonstrate the inconsistencies apparently cited by the ALJ.  (Doc. 16, p. 15 (citing AR 432; 468; 551).)  Though the Court may review "only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely[,]" *Orn*, 495 F.3d at 630, a review of those citations indicates Dr. Hooper observed an anxious and depressed affect, flight of ideas, and delusion on April 4, 2011 (AR 468) and an anxious and depressed affect, pressured speech, flight of ideas, and delusions on December 13, 2011 (AR 432; 551).  These two citations do not demonstrate "minimal mental status findings" contradicting Dr. Hooper's assessment of Plaintiff's ability to concentrate, handle work stress, absences, and ability to engage in part-time work.

The ALJ finally noted that Dr. Hooper dated his November 2012 opinion "back to 10 months prior to [Plaintiff]'s alleged onset date, but this is entirely inconsistent with the fact that [Plaintiff] was actually able to work at substantial gainful activity levels throughout this period."  (AR 33; *see* AR 559 (opining that May 13, 2010, is the "earliest date that the description of symptoms and limitations in this questionnaire applies")).  Plaintiff concedes that she was working in May 2010 and that she continued to work another ten months, but argues that the fact Dr. Hooper "may have affixed an onset date that the ALJ would consider inconsistent with the evidence as a whole does not constitute a valid reason to discredit the opinion of a medical

1  practitioner who, unlike the ALJ, is not fully equipped to render that legal determination."
2  (Doc. 15, p. 23.)  Contrary to Plaintiff's contention, however, Dr. Hooper's use of the May 2010
3  date *does* render his opinion inconsistent with the record as a whole, as it is directly contradicted
4  by Plaintiff's work history.  (*See* AR 240-41; 256; 259; 554-59.)

5       Based on a consistent symptomatology and set of limitations imposed by her diagnosed
6  impairments since May 2010, Dr. Hooper opined Plaintiff was disabled even though the record
7  demonstrated she was capable of working.  This contradiction goes to the heart of how limited Dr.
8  Hooper believed Plaintiff to be -- this is not an issue of whether Dr. Hooper opined to an *onset*
9  date of symptoms prior to Plaintiff's last date of work, where those symptoms worsened and
10  ultimately forced Plaintiff to stop working.  Dr. Hooper's opinion centered on the first date where
11  Plaintiff's "symptoms and limitations [described] in this questionnaire" were *disabling*.  (*See*
12  AR 559 (opining that May 13, 2010, is the "earliest date that the description of symptoms and
13  limitations in this questionnaire applies").)  The fact that Plaintiff demonstrated she was able to
14  work at a time Dr. Hooper considered her symptoms and limitations disabling undercuts his
15  opinion of Plaintiff's *current* functioning and disability.  Dr. Hooper's opinion was therefore not
16  "well-supported" or "consistent with the other substantial evidence in [the] case record."  *Orn*, 495
17  F.3d at 631 (quoting 20 C.F.R. § 404.1527(d)(2)).  The ALJ properly relied on this inconsistency
18  to discount the weight given to Dr. Hooper's opinion.

19       In sum, though the lack of objective clinical findings and inferred reliance upon Plaintiff's
20  subjective testimony, in this case of fibromyalgia, is insufficient to support the ALJ's rejection of
21  Dr. Hooper's opinion regarding Plaintiff's functional capacity, any error in discrediting Dr.
22  Hooper's opinion on those bases is harmless because the ALJ properly discredited Dr. Hooper's
23  opinion as inconsistent with Plaintiff's work history.  *See Carmickle v. Comm'r of Soc. Sec.*
24  *Admin.*, 553 F.3d 1155, 1162 (9th Cir. 2008) (an error is harmless where there "remains
25  substantial evidence supporting the ALJ's conclusions on . . . credibility and the error does not
26  negate the validity of the ALJ's ultimate [credibility] conclusion") (internal citation and quotations
27  omitted) (alteration in original).  The ALJ properly discounted Dr. Hooper's opinion as
28  inconsistent with the record.

### 3.    The ALJ's Consideration of Dr. Beaudoin's Medical Opinion

The ALJ noted Dr. Beaudoin had opined Plaintiff was "totally temporarily disabled in August 2011" but rejected Dr. Beaudoin's opinion as a "temporary excuse[ ] that did not persist for a period of even 12 months" and therefore "do[es] not represent [Plaintiff]'s ability to function over a consistent 12-month period."  (AR 30.)  Under the Social Security Act, a claimant must establish that she was unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment" lasting "for a continuous period of not less than 12 months" and that her period of disability began while she was "insured for disability insurance benefits."  *Thomas v. Barnhart*, 278 F.3d 947, 954-55 (9th Cir. 2002) (quoting 42 U.S.C. §§ 423(a)(1)(A), (d)(1)(A); 20 C.F.R. § 404.1509) (internal quotations omitted).

Section 423(d)(1)(A) "establishes a severity and durational requirement for recognition of disabilities under the Act that accords with the remedial purpose of the Act to protect workers whose disability prevents them from earning a living for a significant period of time."  *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1459 (9th Cir. 1995).  A claimant bears the burden of proving that his impairments satisfy all the criteria of a particular listing.  *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1194 (9th Cir. 2004) (plaintiff bears the burden of proving an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than 12 months); *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir. 1995) ("The claimant bears the burden of establishing. . . . both that she has an impairment listed in the regulations, *and* that she has met the duration requirement") (italics added).  Dr. Beaudoin specifically found that Plaintiff had *only* a temporary disability in August 2011, and opined that Plaintiff had not yet "reached permanent and stationary" disability status as of that date.  (AR 418-20.)  The ALJ properly discredited Dr. Beaudoin's diagnoses and opined limitations on Plaintiff's ability to work as being based on an opinion that Plaintiff was *temporarily* disabled.

Plaintiff also contends the ALJ improperly rejected Dr. Beaudoin's opinion as being unsupported by mental status findings.  (Doc. 15, pp. 24-25 (citing AR 30).)  Plaintiff contends Dr. Beaudoin "rendered an extraordinarily thorough assessment of [Plaintiff], not only having

1   reviewed her mental health records but having administered his own clinical interview, complete

2   with mental status examination, as well as several standardized psychological tests." (Doc. 15, p.

3   25 (citing AR 400-20).)  A review of Dr. Beaudoin's evaluation reveals a rather detailed mental

4   status examination, with observed attitude, mood, affect, speech, orientation, memory dysfunction,

5   thought process, and thought content findings listed and elaborated upon. (AR 413.)  Any error in

6   discrediting Dr. Beaudoin's opinion as unsupported by mental status findings, however, was

7   harmless because the ALJ provided other, legally sufficient reasons for discrediting Dr.

8   Beaudoin's opinion. *See Carmickle*, 533 F.3d at 1162.

9       The ALJ finally gave minimal weight to Dr. Beaudoin's statement that Plaintiff's "mental

10   traits likely affected her ability to cope with conflictual work and interpersonal situations" because

11   it "was not rendered as a concrete statement" and was "based on a work issue with one person and

12   subjective symptom reports, with no actual positive clinical findings supporting problems dealing

13   with conflict." (AR 30.)  Contrary to Plaintiff's contention that "the ALJ d[id] not make clear

14   what he implies by criticizing the doctor's statement as not being 'concrete'" (Doc. 15, p. 21), it is

15   clear that Dr. Beaudoin's ruminations that Plaintiff "likely avoids competition and confrontation

16   and is sensitive to the judgments of others" and "is likely unhappy in work positions that require

17   interpersonal demands" (AR 416) are *not* opinions about Plaintiff's current and permanent

18   functional limitations, particularly given that Dr. Beaudoin determined Plaintiff was only

19   temporarily disabled.

20       That Plaintiff *may* encounter difficulties with "conflictual work" and "interpersonal

21   situations" based on her temporary disability in August 2011 does not imply that such difficulties

22   are *permanent* or functionally limiting, particularly as no other physician adopted such limitations

23   and Dr. Beaudoin himself did not opine to such limitations.  The ALJ was not required to

24   articulate specific and legitimate reasons to reject portions of Dr. Beaudoin's opinion that were

25   ambiguous or equivocal. *See* 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3); *see also Johnson v.*

26   *Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995) ("[w]e will not reverse credibility determinations of

27   an ALJ based on contradictory or ambiguous evidence"); *Tommasetti*, 533 F.3d at 1041 ("the ALJ

28   is the final arbiter with respect to resolving ambiguities in the medical evidence"); *Andrews v,*

1    *Shalala*, 53 F.3d 1035, 1039-40 (9th Cir. 1995) ("[t]he ALJ is responsible for determining

2    credibility, resolving conflicts in medical testimony, and for resolving ambiguities").  The ALJ

3    was also not required to accept and incorporate into her RFC assessment every potential functional

4    limitation, only those for which substantial evidence existed in the record.  *Rounds v. Comm'r of*

5    *Soc. Sec.*, 807 F.3d. 996, 1006 (9th Cir. 2015) (citing *Carmickle*, 533 F.3d at 1165) ("An ALJ may

6    rationally rely on specific imperatives regarding a claimant's limitations, rather than

7    recommendations")); *Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1174 (9th Cir. 2008) (an ALJ

8    may translate mental limitations into "the only concrete restrictions available to h[er]").

9         In sum, the ALJ did not err in according Dr. Beaudoin's opinion minimal weight.

10   **B.     The ALJ's Consideration of Testimony**

11        Plaintiff contends the ALJ failed to articulate clear and convincing reasons for discounting

12   her statements regarding the severity and extent of her ongoing symptoms.  (Docs. 15, 17.)  The

13   Commissioner contends the ALJ properly relied on evidence in the record that undermined the

14   credibility of Plaintiff's subjective complaints.  (Doc. 16.)

15        **1.     Legal Standard**

16        In evaluating the credibility of a claimant's testimony regarding subjective pain, an ALJ

17   must engage in a two-step analysis.  *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009); *Bunnell*

18   *v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc).  The ALJ must first determine whether

19   the claimant has presented objective medical evidence of an underlying impairment that could

20   reasonably be expected to produce the pain or other symptoms alleged.  *Vasquez*, 572 F.3d at 591.

21   The claimant is not required to show that his impairment "could reasonably be expected to cause

22   the severity of the symptom [he] has alleged; she need only show that it could reasonably have

23   caused some degree of the symptom."  *Id.* (quoting *Lingenfelter*, 504 F.3d at 1036).   If the

24   claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the

25   claimant's testimony about the severity of the symptoms if she gives "specific, clear and

26   convincing reasons" for the rejection.  *Id.*

27        The ALJ also may consider (1) the claimant's reputation for truthfulness, prior inconsistent

28   statements, or other inconsistent testimony, (2) unexplained or inadequately explained failure to

seek treatment or to follow a prescribed course of treatment, and (3) the claimant's daily activities. *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008); *see also Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1226-27 (9th Cir. 2009); *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996); 20 C.F.R. §§ 404.1529, 416.929.   "If the ALJ's finding is supported by substantial evidence, the court may not engage in second-guessing." *Tommasetti*, 533 F.3d at 1039.

### 2.     The ALJ's Consideration of Plaintiff's Credibility

The ALJ reviewed the medical record and Plaintiff's allegations that she is unable to perform all work due to her alleged impairments and other symptoms.  (AR 25-33.)  The ALJ found that while Plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms, her statements concerning the intensity, persistence, and limiting effects of those symptoms were not entirely credible.  (AR 26.)  The ALJ found Plaintiff's testimony to be inconsistent with the record as a whole, and pointed to inconsistent statements, a history of conservative treatment, "very minimal positive physical and mental findings," and Plaintiff's acknowledged activities of daily living in discounting her credibility.  (AR 33.)

The parties agree that Plaintiff has fibromyalgia and that it is a severe impairment.  (*See* AR 23.)   The ALJ specifically discounted Plaintiff's testimony as inconsistent with imaging reflecting "minimal, at best, evidence of neurological involvement" and minimal objective findings "generally limited to tenderness, tender points, range of motion, and occasional abnormal strength findings."   (AR 31.)   While the inconsistency of objective medical evidence with subjective claims is generally considered a relevant factor in the ALJ's credibility analysis, *Moisa v. Barnhart*, 367 F.3d 882, 885 (9th Cir. 2004); *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999), fibromyalgia "eludes such measurement" *Benecke*, 379 F.3d at 594; *see also Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869, 872 (9th Cir. 2004) (fibromyalgia is "a medical label that . . . cannot be objectively proved").   Fibromyalgia "is diagnosed entirely on the basis of patients' reports of pain and other symptoms."   *Benecke*, 379 F.3d at 590.  In such cases, the absence of abnormal test results or other discernible symptoms do not undermine claims of fibromyalgia.  *Id.*  (providing that "to date there are no laboratory tests to confirm [fibromyalgia]").   Consequently, while the lack of objective medical findings may

constitute a valid reason to discount Plaintiff's subjective testimony as to the symptoms of her degenerative disc disease, it cannot serve as a basis for discounting Plaintiff's subjective symptom testimony as to her fibromyalgia.

Next, the ALJ discredited Plaintiff's symptom testimony based upon her history of alleged conservative treatment, generally limited to "rare medication adjustments" and a reported history of physical therapy.[5]  (AR 31.)  Plaintiff reported using heat and ice to help relieve her pain at the hearing (AR 48) and the medical record reflects relief obtained with heat, stretching, and narcotic pain medication (AR 379).  Further, Plaintiff testified that every doctor she has treated with has recommended massage as a treatment for her symptoms.  (AR 48; *see* AR 576 (Dr. Hooper, recommending alternating cold packs and moist heat, massage, and home back strengthening exercises).)

Where a plaintiff "complains about disabling pain but fails to seek treatment, or fails to follow prescribed treatment, for the pain, an ALJ may use such failure as a basis for finding the complaint unjustified or exaggerated."  *Orn*, 495 F.3d at 638.  However, there is nothing in the medical record to suggest that Plaintiff's doctors ever recommended less conservative treatments, including injections, surgical intervention, or even physical therapy, as treatment for Plaintiff's *fibromyalgia*.  Indeed, there is nothing in the record to show that less conservative treatment is medically available as a treatment for fibromyalgia.  *See Graf v. Astrue*, No. EDCV 10-1197-MLG, 2011 WL 891104 at *4 (C.D. Cal. Mar. 11, 2011).  While the ALJ's discrediting of Plaintiff's symptom testimony regarding her fibromyalgia symptoms based on conservative treatment or unsupported by objective findings was erroneous, any error is harmless because the ALJ properly discounted Plaintiff's credibility on the basis of other, valid reasons.  *See Carmickle*, 533 F.3d at 1162 (an error is harmless where there "remains substantial evidence supporting the ALJ's conclusions on . . . credibility and the error does not negate the validity of the ALJ's ultimate [credibility] conclusion") (internal citation and quotations omitted) (alteration in original).

---

[5]    The Court notes that despite a reported history of physical therapy, there is no evidence of physical therapy in the record.  (AR 31; *see* AR 48 (testifying that she tried physical therapy and "water therapy" without success).)

Plaintiff also disputes that the ALJ discounted her credibility because the nature of her mental health treatment was "not what one would expect for a totally disabled individual" (AR 27) even though she has taken "various anti-depressants" through the years and demonstrated positive clinical findings on mental status evaluations. (Doc. 15, p. 28.)  While Plaintiff contends that her years of usage of mental health medications demonstrates that she has not sought conservative treatment (Doc. 15, p. 28), it does demonstrate that her mental impairments are effectively controlled by medication (*see* AR 27-32; *see also* AR 430-32; 434-36; 438-48; 450-52; 454-56; 459-60; 462-64; 466-68; 470-72; 474; 478; 563-70; 574-76; 580-82; 585-87; 589-91; 593-96; 598-600). "'Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits.'"  *Taylor v. Astrue*, 386 F. App'x 629, 631-32 (9th Cir. 2010) (quoting *Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006)).

The ALJ also discounted Plaintiff's credibility on the basis of her inconsistent statements regarding her ability to engage in some degree of daily activity. (AR 27.)  "The importance of the credibility of subjective complaint is underscored where, as here, the underlying condition is one that defies objective clinical findings."  *Calkosz v. Colvin*, No. C-13-1624-EMC, 2014 WL 851911 at *5 (N.D. Cal. Feb. 28, 2014).  However, in discounting a plaintiff's credibility, the ALJ may still rely on ordinary indicators of credibility, including pointing to inconsistencies in the record in evaluating a plaintiff's subjective complaints.  *Smolen*, 80 F.3d at 1284; *Moisa*, 367 F.3d at 885; *Thomas*, 278 F.3d at 958-59; *Verduzco v. Apfel*, 188 F.3d 1087, 1090 (9th Cir. 1999) (ALJs may consider whether the Plaintiff's testimony is believable or not).

The ALJ pointed to specific inconsistencies in Plaintiff's testimony.  (AR 27.)  Plaintiff testified that she sleeps excessively but has disturbed sleep, waking up every hour and being unable to go to sleep.  (AR 48; 245; 248.)  Though Plaintiff offers as an explanation that "[b]oth conditions are clearly capable of occurring," Plaintiff testified that she sleeps "long hours at night" (AR 47-48 (she sleeps twelve hours a night)) and reported to her treating physician that she had "no problems with initiation or maintenance of sleep" (AR 433) while contradictorily repeatedly reporting that she had sleep disturbances (*see* AR 245; 349-50; 403; 413; 566; 597; 618).  Plaintiff

1  also reported having difficulty reading but admitted to enjoying reading and to reading her Bible

2  as a form of therapy.  (AR 53-55.)  Despite reporting she does not like to be around people,

3  Plaintiff lives with a roommate, has sustained a long-term relationship with her boyfriend, and

4  visits with family on a regular basis.  (AR 51; 67; 248; 73.)  Plaintiff's inconsistent testimony

5  about her daily living activities was a proper basis for the ALJ to discredit her testimony.  *See*

6  *Moncada v. Chater*, 60 F.3d 521, 524 (9th Cir. 1995); *Light v. Soc. Sec. Admin.*, 119 F.3d 789,

7  792 (9th Cir. 1997).

8       The ALJ further discounted Plaintiff's credibility based on her admitted activities of daily

9  living.  (AR 27.)  While the mere fact that a claimant engages in certain daily activities does not

10  necessarily detract from her credibility as to overall disability, daily activities support an adverse

11  credibility finding if a claimant is able to spend a substantial part of her day engaged in pursuits

12  involving the performance of physical functions or skills that are transferable to a work setting.

13  *Orn*, 495 F.3d at 639; *see also Thomas*, 278 F.3d at 959.  A claimant's performance of chores such

14  as preparing meals, cleaning house, doing laundry, shopping, and interacting with others has been

15  considered sufficient to support an adverse credibility finding when performed for a substantial

16  portion of the day.  *See Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1175 (9th Cir. 2008); *Burch v.*

17  *Barnhart*, 400 F.3d 676, 680-81 (9th Cir. 2005); *Thomas*, 278 F.3d at 959.

18       Here, Plaintiff has consistently been noted to be independent in her activities of daily

19  living: Plaintiff reported being able to prepare simple meals, wash dishes, drive a car, shop for

20  groceries and household supplies 2-3 times a week, walk up to a mile, use a computer for about

21  half an hour at a time, visit with family, mop and vacuum, independently handle her own finances,

22  and do yoga tapes at home[6].  (*See* AR 49-62; 246-50; *see also* AR 273-82 (Plaintiff's boyfriend,

23  stating Plaintiff can do laundry, clean, and cook simple meals).)  These activities tend to suggest

24  that Plaintiff may still be capable of performing the basic demands of unskilled work on a

25  sustained basis.  *See, e.g., Stubbs-Danielson*, 539 F.3d at 1175 (the ALJ sufficiently explained his

26  reasons for discrediting the claimant's testimony because the record reflected that the claimant

27

28  [6]  The Court notes that it is unclear from the face of the record whether Plaintiff does yoga as a form of physical therapy/stretching exercise or for recreation.

performed normal activities of daily living, including cooking, housecleaning, doing laundry, and helping her husband in managing finances.  These types of activities "tend to suggest that the claimant may still be capable of performing the basic demands of competitive, remunerative, unskilled work on a sustained basis.").

Finally, the ALJ discounted Plaintiff's credibility based on her earnings record, which reflected that most of her work history was below the substantial gainful activity level from 1978 until 2010, as "call[ing] into question whether her continued unemployment is truly the result of her allegedly disabling impairments."  (AR 27; 237-43).)   While Plaintiff contends that she explained her work history by testifying that from 1996 through 2006 "she had been working for her father . . . [who] had granted her significant accommodations to lie down on an office couch or go to her car as needed due to her back pain" (Doc. 15, p. 25), the ALJ reasonably took into account Plaintiff's poor work history in his credibility analysis, *Thomas*, 278 F.3d at 959 (noting that claimant "had an extremely poor work history and has shown little propensity to work in her lifetime, which negatively affected her credibility regarding her inability to work"). The ALJ did not err in weighing Plaintiff's extensive work history performing below substantial gainful activity level long before the alleged onset of symptoms as weighing against her credibility.  *See Whitten v. Colvin*, No. 14-35863, 2016 WL 930513, at *1 (9th Cir. Mar. 11, 2016) (finding the ALJ reasonably determined that plaintiff's "poor work history suggested that his primary barrier to work was his lack of motivation, rather than a disability") (citing *Thomas*, *supra*)); *Taylor v. Colvin*, 618 F. App'x 342, 343 (9th Cir. 2015) (same).

In sum, the ALJ did not err in discounting Plaintiff's credibility based on her internally inconsistent testimony, admitted activities of daily living, and poor work history.

## CONCLUSION

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole and is based on proper legal standards.  Accordingly, the Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social

//

//

Security.  The Clerk of this Court is DIRECTED to enter judgment in favor of Carolyn W. Colvin,

Acting Commissioner of Social Security, and against Plaintiff Sheri L. Nelson.

IT IS SO ORDERED.

Dated:   **June 20, 2016**                                     /s/ *Sheila K. Oberto*
                                                              UNITED STATES MAGISTRATE JUDGE